1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9    JAMES RAY BROWN,              1:10-cv-00219-LJO-DLB (HC)

10               Petitioner,         FINDINGS AND RECOMMENDATION
REGARDING PETITION FOR WRIT OF
11     v.                         HABEAS CORPUS

12                                       [Doc. 1]
    JAMES A. YATES,
13

14               Respondent.
    _____/

15

16        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

17 pursuant to 28 U.S.C. § 2254.

18                                BACKGROUND

19        Following a jury trial in the Fresno County Superior Court, Petitioner was convicted of

20 discharging a firearm at an occupied motor vehicle (count 1) and of assault with a firearm (count

21 2).  Cal. Penal Code[1] §§ 246, 245(a)(2).  Street gang enhancements that were attached to both

22 counts and a personal firearm use allegation that was attached to count 2 were found true.  §§

23 186.22(b)(1), 12022.5(a)(1).  Petitioner was sentenced to fifteen years to life imprisonment for

24 count 1; the sentence imposed for count 2 was stayed pursuant to section 654.

25        Petitioner appealed the judgment.  The California Court of Appeal affirmed the judgment

26 in all respects.

27

28        [1] All further references are to the California Penal Code unless otherwise indicated.

1   On May 22, 2007, Petitioner filed a petition for review in the California Supreme Court.

2   The petition was denied on June 27, 2007.

3   On April 9, 2007, Petitioner filed a petition for writ of habeas corpus in the California

4   Court of Appeal, Fifth Appellate District.  The petition was denied on May 3, 2007, without

5   prejudice to refiling the same petition in the superior court.

6   On June 16, 2008, Petitioner filed a petition for writ of habeas corpus in the Fresno

7   County Superior Court.  The petition was denied on July 3, 2008.

8   On August 5, 2008, Petitioner filed a petition for writ of habeas corpus in the California

9   Court of Appeal, Fifth Appellate District.  The petition was denied on May 14, 2009.

10   On May 29, 2009, Petitioner filed a petition for writ of habeas corpus in the California

11   Supreme Court.  The petition was denied on October 28, 2009.

12   Petitioner filed the instant federal petition for writ of habeas corpus on January 19, 2010.

13   Respondent filed an answer to the petition on August 13, 2010.  Petitioner filed a traverse on

14   <u>STATEMENT OF FACTS</u>

15   On October 7, 2005, Brittney Fulmer was driving in her blue Ford Probe
on Jensen Avenue near the on ramp to Highway 41.  Terence Williams was sitting
16   in the front passenger seat and Melvin Cooper was sitting in the back seat behind
Fulmer.  Fulmer was traveling in the far right lane.  Shortly after she proceeded
17   through the intersection and prepared to enter the freeway ramp, she heard the
sound of two gunshots coming from her left.  She looked over and saw a tan or
18   brown Toyota Camry.  This was the only vehicle near her in traffic.  The front
passenger window of the Camry was open.  Fulmer recognized the driver of the
19   Camry as Jamie Stanfield.  A male was sitting in the front passenger seat.  When
Fulmer subsequently examined her car, she observed a bullet hole above the
20   driver's side wheel well.

21   Later that day, Fulmer identified [Petitioner] as the shooter to Fresno
Police Officer Douglas Wright and she selected [Petitioner] and Stanfield in
22   photographic lineups.  Fulmer told Wright that she saw Petitioner's right arm
outside the passenger window.  He was pointing a gun at her.  On January 2,
23   2006, Fulmer told Fresno Police Detective Ron Flowers that "[s]he saw
[Petitioner] extend his arm out of the window of the tan car and fire two shots into
24   her car."

25   Stanfield was arrested and interviewed on October 17, 2005.  Flowers
testified that Stanfield said that she was driving [Petitioner] toward an area of
26   Fresno known as the Dog Pound. [Petitioner] received a cell phone call and
became engaged in a heated conversation with another male.  The caller said that
27   he had been watching [Petitioner] and Stanfield while they were driving.  The
caller wanted to meet [Petitioner] or his group on Jensen Avenue. [Petitioner] told
28   the caller, "Bitch ass nigga. I'm going to get you."  Then he said, "When I catch

2

you I'm going to smoke your black ass." As Stanfield drove onto Jensen Avenue [Petitioner] suddenly rolled down his window, produced a handgun and fired at least one shot at a beige car in the lane to the right of them. Stanfield asked [Petitioner] why he shot at the car. [Petitioner] replied that the car's occupants were from TWAMP (which is an alignment of Black street gangs) and they were about to be attacked. FN2.

     FN2. At trial, Fulmer recanted her statements to the police and testified that she no longer thought that [Petitioner] was the shooter. Stanfield denied knowing [Petitioner] and recanted her statements to Flowers.

     Detective Flowers also gave expert gang testimony. Williams is a member of a street gang known as the Young Black Soldiers (YBS). [Petitioner] is an active member of a street gang known as the Dog Pound Gang (DPG). The primary activities of the DPG include the sale of narcotics, shootings, weapons offenses, assaults, pimping, rape and murder. Flowers testified about two predicate crimes involving DPG members.

     Flowers also testified that the YBS is one of a group of gangs that have aligned together in an association known as TWAMP. The DPG is allied with a rival alignment of gangs known as MUG. DPG members consider members of TWAMP allied gangs to be enemies. If two rival gang members see each other on the street, one will usually attempt to act out before the other.

     Flowers opined that [Petitioner's] act of shooting into Fulmer's car was committed for the benefit of the DPG. The shooting benefitted the DPG in two ways. First, it potentially could have resulted in the death of a rival gang member who is a threat to the DPG. Second, it sent a strong signal to rival gangs that the DPG is a "force to be reckoned with." The shooting indicated to other gangs that DPG members are capable of and willing to use violence. Also, if [Petitioner] had not shot at Williams and this fact became known, [Petitioner] could have been perceived as a coward.

     [Petitioner] presented an alibi defense. Briniece O'Guinn testified that she and [Petitioner] took their two children to a doctor's appointment scheduled around 1:45 p.m. Afterward, they took the bus to the police station and picked her car up from the impound lot. It was stipulated that O'Guinn's vehicle was released to her at approximately 4:51p.m. FN3

     FN3. O'Guinn testified that she did not provide this information to Flowers because she "had [her] dates mixed up."

     In rebuttal, Detective Flowers testified that he interviewed O'Guinn by telephone on January 6, 2006. O'Guinn said that she and [Petitioner] were together with their children at a Motel 6 on October 7, 2005, from 8:00 p.m. to 9:00 p.m.

(Ex. 1 at 4-5.)

///

///

///

1

DISCUSSION

2    A.   Jurisdiction

3         Relief by way of a petition for writ of habeas corpus extends to a person in custody

4    pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

5    or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

6    529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

7    violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

8    out of the Fresno County Superior Court, which is located within the jurisdiction of this Court.

9    28 U.S.C. § 2254(a); 2241(d).

10        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

11   of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

12   enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

13   F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

14   Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct.

15   1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

16   (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

17   petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

18   B.   Standard of Review

19        Where a petitioner files his federal habeas petition after the effective date of the Anti-

20   Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that

21   the state court's adjudication of his claim:

22        (1) resulted in a decision that was contrary to, or involved an unreasonable
          application of, clearly established Federal law, as determined by the Supreme
23        Court of the United States; or

24        (2) resulted in a decision that was based on an unreasonable determination of the
          facts in light of the evidence presented in the State court proceeding.
25

26   28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it "applies a rule that

27   contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are

28   materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown

4

1  v. Payton, 544 U.S. 133,  141 (2005) citing Williams (Terry) v. Taylor, 529 U.S. 362, 405-06

2  (2000).  A state court decision will involve an "unreasonable application of" federal law only if it

3  is "objectively unreasonable." Id., quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti,

4  537 U.S. 19, 24-25 (2002) (per curiam).  "A federal habeas court may not issue the writ simply

5  because that court concludes in its independent judgment that the relevant state-court decision

6  applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations

7  omitted).  "Rather, that application must be objectively unreasonable." Id. (citations omitted).

8       "Factual determinations by state courts are presumed correct absent clear and convincing

9  evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court

10  and based on a factual determination will not be overturned on factual grounds unless objectively

11  unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."

12  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254

13  apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v.

14  Blodgett, 393 F.3d 943, 976-77 (2004).

15       Courts further review the last reasoned state court opinion.  See Ylst v. Nunnemaker, 501

16  U.S. 979, 803 (1991).  However, where the state court decided an issue on the merits but

17  provided no reasoned decision, courts conduct "an independent review of the record . . . to

18  determine whether the state court [was objectively unreasonable] in its application of controlling

19  federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  "[A]lthough we

20  independently review the record, we still defer to the state court's ultimate decisions." Pirtle v.

21  Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

22  C.   Procedural Default

23       Respondent argues that Claims One, Two, Four, Five, Seven, Eleven, and Twelve are

24  procedurally defaulted.[2]

25

26       [2] Respondent notes that although the superior court denied Petitioner's claims of ineffective assistance of
27  trial counsel in claims three, six, seven, eight, nine, ten, eleven, and twelve on the procedural ground that they should
   have been raised on direct appeal, California courts "do not apply [the Dixon] bar[] top claims of ineffective
28  assistance of trial counsel." Robbins, 18 Cal.4th at 815 n.34.  Thus, Respondent does not seek to impose the Dixon
   bar with respect to these ineffective assistance of counsel claims and has addressed those claims on the merits.

1    A claim is procedurally defaulted for federal habeas purposes if the state court relies on

2 state procedural grounds to deny relief.   Coleman v. Thompson, 501 U.S. 722, 729 (1991).

3 This doctrine of procedural default is based on the concerns of comity and federalism. Id. at 730-

4 32.

5    There are limitations as to when a federal court should invoke procedural default and

6 refuse to evaluate the merits of a claim because the petitioner violated a state's procedural rules.

7 Procedural default can only block a claim in federal court if the state court "clearly and expressly

8 states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263

9 (1989).  In this case, the California Supreme Court denied claims one, two, four, five, seven,

10 eleven, and twelve on the procedural ground that "a petitioner cannot rely on grounds that could

11 have been raised in his appeal when seeking relief by way of habeas corpus."[3]  This rule is known

12 as the Dixon bar which prohibits petitioner's from raising claims in state habeas that they could

13 have, but did not, raise on direct appeal.  In re Dixon, 41 Cal.2d 756, 759 (1953).

14    The state law ground must also be independent of federal law.  "For a state procedural

15 rule to be 'independent,' the state law basis for the decision must not be interwoven with federal

16 law." LaCrosse, 244 F.3d at 704, citing Michigan v. Long, 463 U.S. 1032, 1040-41 (1983);

17 Morales v. Calderon, 85 F.3d 1387, 1393 (9th Cir. 1996), quoting Coleman, 501 U.S. at 735

18 ("Federal habeas review is not barred if the state decision 'fairly appears to rest primarily on

19 federal law, or to be interwoven with federal law.'")  "A state law is so interwoven if 'the state

20 has made application of the procedural bar depend on an antecedent ruling on federal law [such

21 as] the determination of whether federal constitutional error has been committed.'" Park v.

22 California, 202 F.3d 1146, 1152 (9th Cir. 2000), quoting Ake v. Oklahoma, 470 U.S. 68, 75

23 (1985).

24 ///

25

26    [3] The Superior Court also denied Petitioner's claims of ineffective assistance of trial counsel in claims three,
27 six, seven, eight, nine, ten, eleven, and twelve on the procedural ground that they should have been raised on direct
appeal, California courts "do not apply [the Dixon bar[] to claims of ineffective assistance of trial counsel."
28 Robbins, 18 Cal.4th at 815 n.34.  As a consequence, Respondent does not seek to impose the Dixon bar with respect
to theses ineffective assistance of counsel claims.

6

"A default under an independent and adequate state procedural rule operates as a bar in federal court unless the petitioner can show cause for and prejudice from the default." Valerio v. Crawford, 306 F.3d 742, 773 (9th Cir. 2002) (citing Wainwright v. Sykes, 433 U.S. 72 (1977)). Normally, "cause to excuse a default exists if the petitioner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Cook v. Schriro, 538 F.3d 1000, 1027 (9th Cir. 2008) (internal quotation marks omitted).

"[P]rior to 1998 [the California courts] necessarily addressed fundamental constitutional claims when applying the *Dixon* rule." Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (citing In re Robbins, 18 Cal.4th 770 (1998)). Therefore, prior to 1998, a California court "made an antecedent ruling on federal law before applying the Dixon bar to any federal constitutional claims . . ., by concluding that no fundamental constitutional error had occurred." Id. at 1153. Justice Koziniski has recently explained the independence of the Dixon ruling stating:

> That all changed with *In re Robbins*, where the California Supreme Court explained that "we shall assume, for the purpose of addressing the procedural issue, that a federal constitutional error is stated, and we shall find the exception inapposite if, based upon our application of state law, it cannot be said that the asserted error 'led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner." 18 Cal.4th 770, 811-12, 77 Cal.Rptr.2d 153, 959 P.2d 311 (1998) (quoting *In re Clark*, 5 Cal.4th 750, 797, 21 Rptr.2d 509, 855 P.2d 729 (1993)). "The purpose of this approach was to establish the adequacy and independence of the State Supreme Court's future *Dixon/Robbins* rulings and to indicate that a prisoner seeking collateral relief with respect to new federal claims no longer had any recourse to exhaust in the state courts." *Park*, 202 F.3d at 1152 n.4. Although the Ninth Circuit hasn't addressed the independence of California's *Dixon* rule post-*Robbins*, when evaluating a different procedural bar with the same exceptions it held that "the California Supreme Court's post-*Robbins* denial of [petitioner's] state petition for lack of diligence (untimeliness) was not interwoven with federal law and therefore is an independent procedural ground." *Bennett v. Mueller*, 322 F.3d 573, 582-583 (9th Cir. 2003). *Robbins* thus converted *Dixon* into an independent state ground. See *Protsman v. Pliler*, 318 F.Supp.2d 1004, 1007-09 (S.D. Cal. 2004) (reaching the same conclusion).

Smith v. Crones, 2010 WL 1660240 at * 1 (E. D. Cal. Apr. 22, 2010).

Based on the reasoning set forth by in Crones, the Dixon bar is independent of federal law. The next determination is whether the rule is adequate. Once the Respondent has "pled the existence of an independent and adequate state procedural ground as an affirmative defense, the

///

1    burden to place that defense in issue shifts to the petitioner." <u>Bennett v. Mueller</u>, 322 F.3d 573,

2    582-583 (9th Cir. 2003).

3         Petitioner initially argues that claim two was presented on direct appeal.  The Court

4    agrees with Petitioner and finds that the procedural bar cannot be imposed on Claim Two as it

5    was presented to and addressed by the state appellate court.  <u>See</u>, <u>infra</u>, Ground E.

6         Petitioner argues that claims one and four involve federal due process issues for which

7    <u>Dixon</u> does not apply.  The mere statement or presentation of a federal due process claim does

8    not establish one of the exceptions to the application of the <u>Dixon</u> bar.[4]  Petitioner has not meet

9    his burden of demonstrating that the <u>Dixon</u> rule is not adequately applied by the state court and

10   therefore these claims are procedurally barred.  Notwithstanding the procedural default, for the

11   reasons explained below the claims fail on their merits.

12   D.    <u>Insufficient Evidence to Support Finding Offenses Were Committed for Benefit of Gang</u>

13        Petitioner claims there was insufficient to prove that the "sale of illegal drugs" was a

14   "primary activity" of the Dog Pound Gang ("DPG"), as defined in California Penal Code §

15   186.22.  This claim was presented to the Fresno County Superior Court, the California Court of

16   Appeal, and the California Supreme Court by way of post-conviction review petitions.  The

17   Fresno County Superior Court found that Petitioner could have, but did not, raise this claim on

18   direct review.  The California Court of Appeal and the California Supreme Court summarily

19   denied the claim, and it is presumed these courts denied the claim on the same procedural ground

20   identified by the Fresno County Superior Court.  <u>Ylst v. Nunnemaker</u>, 501 U.S. at 803.

21        The law on insufficiency of the evidence claim is clearly established.  The United States

22   Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a

23   federal court must determine whether, viewing the evidence and the inferences to be drawn from

24   it in the light most favorable to the prosecution, any rational trier of fact could find the essential

25   elements of the crime beyond a reasonable doubt.  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).

26   ─────────────────

27        [4] The four exceptions to the <u>Dixon</u> bar are: (1) "'fundamental constitutional error,'" (2) a lack of
     "fundamental jurisdiction'" by the trial court over the petitioner, (3) the trial court's "'acting in excess of
     jurisdiction'" and (4) an intervening "'change in the law.'"  <u>Park v. California</u>, 202 F.3d 1146, 1152 (9th Cir. 2000)

28   (citing <u>Fields v. Calderon</u>, 125 F.3d 757, 763 (9th Cir. 1997) (quoting <u>In re Harris</u>, 21 Cal.Rptr.2d 373.)

1   Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

2   In this instance, the jury was instructed with California Penal Code § 186.22 as follows:

3          If you find the defendant guilty of either of the crimes charged in Counts
    One or Two, you must then decide whether, for each crime, the People have
4   proved the additional allegation that the defendant committed that crime for the
    benefit of, at the direction of, or in association with a criminal street gang.  You
5   must decide whether the People have proved this allegation for each crime and
    return a separate finding for each crime.

6          To prove this allegation, the People must prove that:

7          1. The defendant committed the crime for the benefit of, at the direction
8   of, or in association with a criminal street gang;

9          AND

10         2. The defendant intended to assist, further, or promote criminal conduct
    by gang members.

11         A criminal street gang is any ongoing organization, association, or group
12  of three or more persons, whether formal or informal:

13         1. That has a common name or common identifying sign or symbol;

14         2. That has, as one of its primary activities, the sale of illegal drugs;

15         AND

16         3. Whose members, whether acting alone or together, engage in or have
    engaged in a pattern of criminal street activity.

17         In order to qualify as a primary activity, the crime must be one of the
18  group's chief or principal activities rather than an occasional act committed by
    one or more persons who happen to be members of the group.

19         A pattern of criminal gang activity, as used here, means:

20         1. The commission of, or conviction of, any combination of two or more
21  of the following crimes: Possession of Illegal Drugs for purposes of Sale in
    violation of Health and Safety Code Section 11351.

22         2. At least one of those crimes was committed after September 26, 1988;

23         3. The most recent crime occurred within three years of one of the earlier
24  crimes;

25         AND

26         4. The crimes, if any, that establish a pattern of criminal activity, need not
    be gang-related.

27         The People need not prove that the defendant is an active or current
28  member of the alleged criminal street gang.

1

2

      You may not find that there was a pattern of criminal gang activity unless all of you agree that two or more crimes that satisfy these requirements were committed, but you do not have to all agree on which crimes were committed.

3

4

      The People have the burden of proving each allegation beyond a reasonable doubt.  If the People have not met this burden, you must find that the allegation has not been proved.

5    (CT 165-166.)

6          Under California law, "[s]ufficient proof of the gang's primary activities might consist of

7    evidence that the group's members consistently and repeatedly have committed criminal activity

8    listed in the gang statute."  People v. Sengpadychith, 26 Cal.4th 316, 324 (2001).  A gang's

9    primary activity can be established through expert testimony.  Id.; see also CALJIC No. 17.24.2.

10         Here, there was sufficient evidence to support the jury's finding that one of the primary

11   activities of the DPG was the sale of illegal drugs.  Detective Flowers was assigned to the Multi

12   Agency Gang Enforcement Consortium (M.A.G.E.C.), a unit that undertook gang investigations

13   and the gathering of intelligence information.  When initially assigned to M.A.G.E.C., Detective

14   Flowers was on the tactical portion of the team which conducts its own intelligence, and writes

15   search warrants related to gang crimes and investigations.  He was then assigned as a detective to

16   the unit and conducted investigations pertaining to gang-related activities that involved African-

17   American gangs in Fresno.  At the time of trial, Flowers had been in the unit for two years and a

18   detective for a over one year, out of his seven years of service as a police officer.  During the

19   course of his career, Detective Flowers had interviewed over 700 gang members.  Detective

20   Flowers prior assignments were mainly in the Southwest portion of Fresno where most African-

21   American gangs are located.  Flowers had regular contact with gang members to gain

22   intelligence.    Detective Flowers testified that Dog Pound is an area in Southwest Fresno and a

23   gang in that area which began in the 1980's and validated in 1990's.  He estimated the gang to

24   have approximately 70 to 73 active members.  (RT 444.)  The predominant color of choice is red.

25   (Id.)  The primary activities of the DPG is narcotics, shootings, weapons offense, felony assault,

26   pimping, rape, and murder.  (RT 445.)  Detective Flowers testified that Donald Eugene Hollins

27   and Robert Peel, both known members of the DPG suffered a prior conviction for narcotics sales

28   in 2005.  (RT 474-475.)  Thus, the foregoing evidence is sufficient to establish that one of the

1  primary activities of the DPG was the sale of narcotics and relief is foreclosed.

2  E.  <u>Insufficient Evidence to Support Finding Shooting Was Intended to Promote, Further, or Assist in Criminal Conduct by Gang Members</u>

3

4  Petitioner contends that the evidence was insufficient to prove that the shooting was

5  committed to benefit the DPG, a required element necessary to support the gang enhancement.

6  The California Court of Appeal rejected the claim on the merits in a reasoned decision, and the

7  California Supreme Court denied review.

8  The California Court of Appeal found sufficient evidence to support the jury's finding

9  stating:

10  Flowers testified that Stanfield told her that [Petitioner] was involved in a heated conversation on his cell phone with another male immediately prior to the shooting. [Petitioner] repeated the caller's statements to the effect that the caller wanted to meet [Petitioner] or his group on Jensen Avenue. The caller also said that he had been watching [Petitioner] and Stanfield while they were driving. [Petitioner] told the caller, "Bitch ass nigga. I'm going to get you." Then he said, "When I catch you I'm going to smoke your black ass." After [Petitioner] fired the shot or shots at the Camry, he told Stanfield that he did so because the Camry contained TWAMP enemies who were going to attack him.

11

12

13

14

15  Detective Flowers opined that the shooting benefitted the DPG in two ways. First, this shooting had the potential of taking out a rival gang member. Williams was a passenger in the Camry. He was a well-known YBS member who appeared in a locally produced gang video entitled Fresno Uncensored. If two rival gang members see each other on the street, one will usually attempt to act out before the other one can act. Second, this shooting sent a signal to rival gangs that the DPG gang is "a force to be reckoned with." The shooting demonstrated to rival gangs that the DPG members are willing to use violence, even when there is a risk that an innocent bystander could be injured.

16

17

18

19

20  [Petitioner] asserts that Detective Flowers's testimony should be disregarded because it is not supported by direct or circumstantial evidence, even hearsay, from another source. We disagree. This argument ignores statements Stanfield made to Flowers. Stanfield recounted the cell phone conversation between [Petitioner] and another male immediately prior to the shooting and she relayed [Petitioner's] explanation why he fired at the Camry. Stanfield's statements to Flowers provide a factual basis supporting Flower's opinion that [Petitioner] shot at the car because it contained rival TWAMP gang members and [Petitioner] believed that he was going to be attacked by them. Detective Flower's expertise was necessary only to give meaning to [Petitioner's] words and actions. (*People v. Gamez* (1991) 235 Cal.App.3d 957, 967, 978; *People v. Ward* (2005) 36 Cal.4th 186, 210.) FN4

21

22

23

24

25

26

27  FN4. [Petitioner's] reliance on *People v. Killebrew* (2002) 103 Cal.App.4th 644 is misplaced. *Killebrew* involved a conspiracy to possess a handgun. There was conflicting testimony whether the defendant was in one of the three vehicles at issue. The appellate court reversed and held that the gang

28

11

expert should not have been permitted to testify about the subjective intent and knowledge of each occupant of the vehicles. Here, [Petitioner] personally fired the shots at the Camry and he told Stanfield that he did so because the car contained TWAMP enemies who were going to attack him.

      [Petitioner's] assertion that a "retaliatory strike out of fear of an imminent attack is not conduct" promoting or furthering gang activity is mere opinion. Flowers proffered expert testimony that [Petitioner's] act of shooting at the Camry benefitted the DPG gang because it could have eliminated a rival and it demonstrated a willingness to use deadly force. Flowers's credibility was a matter for the jury to assess; such credibility determinations are not reweighed on appeal. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.)

      Accordingly, we find that the record contains substantial evidence from which a jury could conclude beyond a reasonable doubt that the shooting was committed for the benefit of the DPG gang and that [Petitioner] had the specific intent to promote, assist or further criminal conduct by DPG gang members when he fired the handgun.

(Ex. 1 at 5-7.)

With regard to the sufficiency of the evidence to support a gang enhancement under

section 186.22, the Ninth Circuit has recently held:

      California law requires the prosecutor to prove two things. First, the prosecutor must demonstrate that the defendant committed a felony "for the benefit of, at the direction of, or in association with [a] criminal street gang." Cal. Penal Code § 186.22(b)(1). Second, the prosecutor must show that the defendant committed the crime "with the specific intent to promote, further, or assist in any criminal conduct by gang members." Id. We have previously recognized the importance of keeping these two requirements separate, and have emphasized that the second step is not satisfied by evidence of mere membership in a criminal street gang alone.

Briceno v. Scribner, 555 F.3d 1069, 1078 (9th Cir. 2009) (citing Garcia v. Carey, 395 F.3d 1099,

1102-1103 & n.9 (9th Cir. 2005). In Briceno, the gang expert testified in terms of "generalities"

that the crimes could glorify the gang, but did not provide direct or circumstantial evidence

regarding the defendant's specific intent. Briceno, 555 F.3d at 1078. In such circumstances, the

Ninth Circuit held the expert testimony did not establish the petitioner's specific intent in

committing the crimes. Id. at 1078-1079. This was particularly so in Briceno because the

defendant submitted proof of a different motivation, i.e. personal gain.

Subsequent to Garcia v. Carey, the California courts have held that section 186.22's

specific intent element does not require the intent to enable or assist criminal activities by gang

members aside from the offense charged. The intent to commit the gang related offense suffices.

1  See e.g., People v. Hill, 142 Cal.App.4th 770, 774 (2006); People v. Romero, 140 Cal.App.4th

2  15, 19-20 (2006); People v. Vasquez, 178 Cal.App.4th 347, 353-354 (2009).  Because of the

3  conflict, the Ninth Circuit recently asked the California Supreme Court to decide the question of

4  state law.  Emery v. Clark, 604 F.3d 1102 (9th Cir. 2010).  On June 23, 2010, the California

5  Supreme Court granted the request for certification and deferred further action pending

6  consideration of a related issue in People v. Albillar, 162 Cal.App.4th 935 (2008).  On December

7  20, 2010, the California Supreme Court issued its decision in Albillar and rejected the Ninth

8  Circuit's reasoning in Garcia and Briceno finding "[t]here is no statutory requirement that this

9  'criminal conduct by gang members' be distinct from the charged offense, or that the evidence

10  establish specific crimes the defendant intended to assist his fellow gang members in

11  committing." (Citations omitted).  People v. Albillar, __ Cal.Rptr.3d __, 51 Cal.4th 47, 2010

12  WL 5140768 *13  (Cal. 2010).  Therefore, the California Supreme Court has specifically

13  interpreted its law to the contrary of the interpretation in Briceno and Garcia, and such rulings are

14  inoperative.

15         In any event, the evidence was sufficient even under the Ninth Circuit's prior

16  interpretation of California law.  In this instance, there is sufficient evidence that Petitioner

17  committed the shooting with the specific intent to promote, further, or assist in any criminal

18  conduct by gang members.  The evidence before the jury supported the finding that Petitioner

19  shot at the Camry because it contained rival TWAMP gang members, and his act of shooting the

20  vehicle benefitted his gang because it could have eliminated a rival gang member and it

21  demonstrated a willingness to use deadly force.  Thus, unlike in Bricerno, where there was no

22  connection between the gang and the robberies, there was specific expert testimony on how the

23  shooting benefitted Petitioner's gang.  In addition, unlike Bricerno, where the defendants claimed

24  to have robbed the victims to obtain money to buy Christmas presents, there was no evidence of

25  an alternate purpose for Petitioner shooting at the rival gang members.  Accordingly, the state

26  appellate court's decision was not objectively unreasonable nor an unreasonable determination of

27  the facts in light of the evidence.

28

F.   <u>Ineffective Assistance of Counsel For Failure to Highlight the Records Inadequacies for the Jury</u>

Petitioner contends that he was denied his Sixth Amendment right to effective assistance of counsel.  More specifically, he claims that the evidence was "technically sufficient to prove the 'primary activity' and 'gang-related' elements," his attorney was ineffective for "failing to highlight the records inadequacies for the jury."  This claim was presented to the Fresno County Superior Court, the California Court of Appeal, and the California Supreme Court.  The Fresno County Superior Court denied the claim on the procedural ground that Petitioner should have, but did not, raise this claim on direct review.  The California Court of Appeal and California Supreme Court both summarily denied the claim, and it is presumed these courts denied the claim on the same procedural ground as identified by the Fresno County Superior Court.  <u>Ylst</u>, 501 U.S. at 803.

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  <u>Canales v. Roe</u>, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); <u>Lowry v. Lewis</u>, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  <u>Strickland</u>, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances.  <u>Id</u>. at 688; <u>United States v. Quintero-Barraza</u>, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  <u>Strickland</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); <u>Sanders v. Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir.1994).

1    Second, the petitioner must show that counsel's errors were so egregious as to deprive

2    defendant of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688. The court must

3    also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

4    ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356,

5    1461 (9th Cir. 1994). More precisely, petitioner must show that (1) his attorney's performance

6    was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that

7    (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would

8    have been different.

9    A court need not determine whether counsel's performance was deficient before

10   examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

11   Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984). Since it is necessary to prove

12   prejudice, any deficiency that does not result in prejudice must necessarily fail.

13   Ineffective assistance of counsel claims are analyzed under the "unreasonable

14   application" prong of Williams v. Taylor, 529 U.S. 362 (2000). Weighall v. Middle, 215 F.3d

15   1058, 1062 (2000).

16   Petitioner has not established either prong of the Strickland standard. As set forth above,

17   the gang enhancement allegations were supported by the record. Faced with this evidence,

18   counsel made a tactical decision to challenge the underlying charges instead of the gang

19   allegations. Indeed, during closing argument, defense counsel told the jury "[b]ecause you never

20   get to the gang enhancements or allegations or whatever you want to call them because you never

21   find the crime. (RT 838-839.) If counsel had been successful in his challenge to the underlying

22   offenses, the gang enhancements would have become moot. Counsel's strategic decision, such

23   as this, is entitled to substantial deference particularly on collateral review. See Yarborough v.

24   Gentry, 540 U.S. 1, 5-6 (2003) ("counsel has wide latitude in deciding how best to present a

25   client, and deference to counsel's tactical decisions in [her] closing presentation is particularly

26   important because of the broad range of legitimate defense strategy at that stage."); see also

27   Hovey v. Ayers, 458 F.3d 892, 906 (9th Cir. 2006) (noting that recent decisions by the Supreme

28   Court have "stress[ed] the deference owed to the choices made by defense counsel in crafting

1   summations").

2       In any event, even if counsel was inadequate during closing argument for failing to

3   challenge the gang enhancements, there is not a "reasonable probability" that a different closing

4   argument would have made a difference in the outcome of the trial.  The prosecution gang expert

5   testified about the rivalry between the DPG gang the TWAMP gang and opined that the shooting

6   was committed to benefit the DPG.  Given such strong evidence, there is no showing of a

7   reasonable probability that the jury would not have found the gang enhancement true if counsel

8   had argued different during closing summation.  Strickland, 466 U.S. at 690.

9   G.     Instructional Error-CALCRIM No. 332

10      Petitioner contends that Jury Instruction No. 332 violated his "rights to due process, jury

11  trial, and proof of guilt beyond a reasonable doubt."  This claim was presented to the Fresno

12  County Superior Court, the California Court of Appeal, and the California Supreme Court in

13  post-conviction review proceedings.  The Fresno County Superior Court denied the claim in a

14  reasoned decision on the procedural ground that Petitioner should have, but did not, raise the

15  claim on direct review.  Because the California Court of Appeal and California Supreme Court

16  both issued summary denials, this Court presumed it adopted the reasoning of the superior court.

17  Ylst, 501 U.S. at 803.

18      A challenge to a jury instruction solely as an error under state law does not state a claim

19  cognizable in a federal habeas corpus action.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).

20  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the

21  ailing instruction by itself so infected the entire trial that the resulting conviction violates due

22  process.  Id. at 72.  Additionally, the instruction may not be judged in artificial isolation, but

23  must be considered in the context of the instructions as a whole and the trial record. Id.  The

24  court must evaluate jury instructions in the context of the overall charge to the jury as a

25  component of the entire trial process.  See United States v. Frady, 456 U.S. 152, 169 (1982)

26  (citing Henderson v. Kibbe,  431 U.S. 145, 154 (1977)).  Furthermore, even if it is determined

27  that the instruction violated the petitioner's right to due process, a petitioner can only obtain

28  relief if the unconstitutional instruction had a substantial influence on the conviction and thereby

resulted in actual prejudice under <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637, 113 S.Ct. 1710

(1993) (whether the error had a substantial and injurious effect or influence in determining the

jury's verdict.). <u>See</u> <u>Hanna v. Riveland</u>, 87 F.3d 1034, 1039 (9th Cir. 1996).  The burden of

demonstrating that an erroneous instruction was so prejudicial that it will support a collateral

attack on the constitutional validity of a state court's judgment is even greater than the showing

required to establish plain error on direct appeal." <u>Id</u>.

       CALCRIM No. 332 deals with expert testimony and instructed the jury as follows:

> A witness was allowed to testify as an expert and to give opinions.  You
> must consider the opinions, but you are not required to accept them as true or
> correct.  The meaning and importance of any opinion are for you to decide.  In
> evaluating the believability of an expert witness, follow the instructions about the
> believability of witnesses generally.  In addition, consider the expert's knowledge,
> skill, experience, training, and education, the reasons the expert gave for any
> opinion, and the facts or information on which the expert relied in reaching that
> opinion.  You must decide whether information on which the expert relied was
> true and accurate.  You *may* disregard any opinion that you find unbelievable,
> unreasonable, or unsupported by the evidence.
>
> An expert witness may be asked a hypothetical question.  A hypothetical
> question asks the witness to assume certain facts are true and to give an opinion
> based on the assumed facts.  It is up to you to decide whether an assumed fact has
> been proved.  If you conclude that an assumed fact is not true, consider the effect
> of the expert's reliance on that fact in evaluating the expert's opinion.

(CT 157, emphasis added.)

       Petitioner's main challenge is to the use of the term "may" in the last sentence of the first

paragraph.  Petitioner claims the instruction implies that the jury may, but is not required to,

reject an unsupported opinion.  He reasons the instruction allows the jury to rely on an

unsupported expert opinion.  Petitioner contends Detective Flowers' unsupported opinion was

the sole evidence to meet the "primary activity" element that the shooting was gang-related, and

this instruction undermined the reasonable doubt standard by allowing the jury to convict on less

than sufficient evidence.

       Petitioner's claim is without merit.  To demonstrate relief on this claim, Petitioner must

show that there is a reasonable likelihood the jury found Detective Flowers' testimony relating to

the gang enhancement was "unsupported," but chose to rely on it in finding the gang

enhancement true.  The record simply does not support such finding.  Contrary to Petitioner's

1   claim, Detective Flowers' expert testimony was well-supported by the evidence in the record.

2   Accordingly, there is simply no basis to conclude that the jury relied on expert testimony it found

3   to be unsupported by the evidence, and Petitioner has not demonstrated there is a reasonable

4   likelihood the jury applied the instruction in an unconstitutional manner.

5   H.      Instructional Error/Accomplice Corroboration Requirement

6           Petitioner claims the trial court erred by failing to properly instruct the jury on the

7   accomplice corroboration requirement.  Petitioner presented this claim to the Fresno County

8   Superior Court, California Court of Appeal, and California Supreme Court in post-conviction

9   collateral review proceedings.  The Fresno County Superior Court denied the claim on the

10  procedural ground that Petitioner should have, but did not, raise this claim on direct review.

11  Because the California Court of Appeal and California Supreme Court summarily denied the

12  claim, this Court looks through those decisions to that of the Fresno County Superior Court.

13  Ylst, 501 U.S. at 803.

14          Section 1111 provides that "[a] conviction can not be had upon the testimony of an

15  accomplice unless it be corroborated by such other evidence as shall tend to connect the

16  defendant with the commission of the offense; and the corroboration is not sufficient if it merely

17  shows the commission of the offense or the circumstances thereof."   In accordance, the jury was

18  instructed with CALCRIM 334, which provided:

19          Before you may consider the testimony of Jamie Stanfield as evidence
        against the defendants regarding the crimes charged, you must decide whether
20      Jamie Stanfield was an accomplice to those crimes with which the defendant is
        charged.  A person is an accomplice if she is subject to prosecution for the
21      identical crimes charged against the defendant.  Someone is subject to prosecution
        if she personally committed the crime or if:
22
            1. She knew of the criminal purpose of the person who committed the
23      crime;

24          AND

25          2. She intended to, and did in fact aid, facilitate, promote, encourage, or
        instigate the commission of the crime.
26
            The burden is on the defendant to prove that it is more likely than not that
27      Jamie Stanfield was an accomplice.

28          An accomplice does not need to be present when the crime is committed.

18

On the other hand, a person is not an accomplice just because she is present at the scene of a crime, even if she knows that a crime will be committed or is being committed and does nothing to stop it.

A person may be an accomplice even if she is not actually prosecuted for the crime.

If you decide that a witness was not an accomplice, then you may not convict a defendant of either of the charged crimes based on her statement or testimony alone. You may use the statement or testimony of an accomplice to convict the defendant only if:

1. The accomplice's statement or testimony is supported by other evidence that you believe;

2. That supporting evidence is independent of the accomplice's statement or testimony;

AND

3. That supporting evidence tends to connect the defendant to the commission of the crimes.

Supporting evidence, however, may be slight. It does not need to be enough by itself to prove that the defendant is guilty of the crimes alleged, and it does not need to support every fact about which the accomplice testified. On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must end to connect the defendant to the commission of the crime.

Any statement or testimony of an accomplice that tends to incriminate a defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all of the other evidence.

(CT 159-160.)

Habeas corpus relief is not available to correct alleged errors in the state court's application or interpretation of state law. Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480 (1991); see also Rivera v. Illinois, __ U.S. __, 129 S.Ct. 1446, 1454 (2009) ("the mistaken denial of a state-provided peremptory challenge does not, without more, violate the Federal Constitution. '[A] mere error of state law,' we have noted, 'is not a denial of due process'") (quoting Engle v. Isaac, 456 U.S. 107, 121 n.21 (1982)). "A federal court may not issue a writ on the basis of a perceived error of state law." Pulley v. Harris, 465 U.S. 37, 41 (1984); Watts v. Bonneville, 879 F.2d 685, 687 (9th Cir. 1989) (alleged violation of state sentencing statute). If only a violation of state law is alleged, the petition is subject to dismissal. Favors v. Eyman, 466

19

1  F.2d 1325, 1327 (9th Cir. 1972).

2      Petitioner claims arises from the application of California evidentiary rules.  Thus, the

3  claim is not cognizable in a federal habeas corpus petition.  Estelle, 502 U.S. at 68.  The fact that

4  Petitioner characterizes his claim as a due process violation is irrelevant.  A habeas petitioner

5  may not transform a state law issue into a federal one merely by asserting a due process violation.

6  Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996).  Moreover, in order for a state law to

7  create a liberty interest protected by the United States Constitution, the state law must meet two

8  requirements: the law must set forth substantive predicates to govern official decision-making,

9  and it must contain explicitly mandatory language, i.e., a specific directive to the decisionmaker

10  that mandates a particular outcome if the substantive predicates have been met.  Kentucky Dept.

11  of Corrections v. Thompson, 490 U.S. 454, 462-463 (1989).  Neither of these requirements were

12  met in this instance.  In any event, California courts have repeatedly found that CALCRIM 334

13  satisfies the requirements set forth in Section 1111, see People v. Barillas, 2009 WL 296997 * 5

14  (Cal. App. 6 Dist. 2009); People v. Grant, 2008 WL 4216125 *5 n.5 (Cal. App. 4 Dist. 2008),

15  and there is no basis to find a federal liberty interest.  Clemons v. Mississippi, 494 U.S. 738, 747

16  (1990) (no liberty interest where state did not create entitlement).

17      In any event, Petitioner's challenge to CALCRIM No. 334, is without merit, for the

18  reasons explained in People v. Grant, 2008 WL 4216125 (Cal. App. 4 Dist. 2008), which rejected

19  a similar argument:

20          Grant also criticizes CALCRIM No. 334's discussion of the nature of the
        corroboration required, arguing that CALJIC No. 3.12 provided a better
21      discussion of this subject.  We do not find any error.  CALCRIM No. 334 states
        that the requisite corroboration must be such that it "tends to connect the
22      defendant to the commission of the crime" and that "it is not enough" if that
        evidence "merely shows that a crime was committed or the circumstances of its
23      commission[;] [it] must tend to connect the defendant to the commission of the
        crime."  This is almost identical to language from CALJIC No. 3.12, which
24      similarly states that the jury must find corroboration that "tends to connect
        defendant with the commission of the crime."  Consequently, we do not believe
25      the trial court erred by relying on the CALCRIM instruction rather than the
        CALJIC instruction.  Further, even if there was error, it would not be prejudicial
26      as we would be required, in any event, to presume the jury determined Laymon
        was not an accomplice.

27  Id. at *5 n.5

28

1    In addition, Petitioner's related ineffective-assistance-of-counsel claim fails because there

2 is no merit to Petitioner's claim.  Because there was no basis for counsel to object to CALCRIM

3 No. 334, counsel was not deficient, nor was Petitioner prejudiced by the failure to object.

4 Strickland, 466 U.S. at 687-688, 694; Baumann v. United States, 692 F.2d 565, 572 (9th Cir.

5 1982) ("The failure to raise a meritless legal argument does not constitute ineffective assistance

6 of counsel.").

7 I.    Ineffective Assistance Counsel/Failure Request Cautionary Instruction

8    Petitioner claims counsel was ineffective for failing to request a cautionary instruction.

9 Because the California Court of Appeal and California Supreme Court issued summary denials,

10 this Court looks through to the reasoned decision of the Fresno County Superior Court.

11    During trial, statements made by Stanfield to Petitioner were admitted.  Petitioner claims

12 that because his statements to Stanfield were inculpatory, trial counsel should have requested an

13 instruction advising the jury that "evidence of an oral admission of the defendant should be

14 viewed with caution."

15    Contrary to Petitioner's claim, the jury was given the cautionary instruction which stated:

16    [a]ny statement or testimony of an accomplice that tends to incriminate the
defendant should be viewed with caution.  You may not, however, arbitrarily
17 disregard it.  You should give that statement or testimony the weigh you think it
deserves after examining it with care and caution and in the light of all the other
18 evidence.

19
(CT 160 [CALRIM No. 334].)  Thus, there is simply no merit to Petitioner's claim that counsel
20
was deficient nor was Petitioner prejudiced, and there is no basis for habeas corpus relief.
21
J.    Ineffective Assistance Counsel/Failure Request Unanimity Instruction
22
   Petitioner claims counsel was ineffective for failing to request a unanimity instruction.
23
The California Court of Appeal rejected this claim on direct review, and the California Supreme
24
Court denied review.
25
   The California Court of Appeal analyzed the claim as follows:
26
   The fact that the information alleged that the assault was committed
27 against two victims did not deny appellant his right to a unanimous jury verdict.

28    A. Facts

Count 2 of the amended information alleged that appellant assaulted Brittany Fulmer and Terrace Williams with a firearm.

The jury was instructed on the elements of this crime, as follows:

"The defendant is charged in Count Two with assault with a firearm.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant did an act with a firearm that by its nature would directly and probably result in the application of force to a person;

"2. The defendant did that act willfully;

"3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone;

"AND

"4. When the defendant acted, he had the present ability to apply force with a firearm to another person.

"Someone commits an act willfully when he does it willingly or on purpose. It is not required that he intend to break the law, hurt someone else, or gain any advantage.

"The People are not required to prove that the defendant actually intended to use force against someone when he acted.

"No one needs to actually have been injured by defendant's act. But if someone was injured, you may consider that fact, along with all the other evidence, in deciding whether the defendant committed an assault."

In relevant part, the verdict form stated, "WE, the jury ... find the defendant ... guilty of VIOLATION OF SECTION 245(a)(2), of THE PENAL CODE, a felony, ASSAULT WITH A FIREARM, as charged in Count Two of the First Amended Information."

B. Appellant was not denied the right to an unanimous verdict.

Because two victims were charged in connection with count 2 and the court did not give a unanimity instruction, appellant asserts that his constitutional right to a unanimous jury verdict was infringed. We disagree.

Appellant expressly rejected a unanimity expression. Before the court instructed the jury, it made the following comment setting forth agreements that were reached during the instructional conference with counsel:

" ... We also discussed the fact that sometimes there is a need for instructions concerning unanimity. In this particular case [, because] these shots, if there were two shots fired, essentially [occurred] in a continuous course of conduct, both of you are in agreement and [defense counsel] in particular there is

22

no need to give a unanimity instruction, correct?"

Defense counsel replied, "Correct."

This exchange demonstrates that defense counsel consciously chose not to have the jury instructed on the concept of unanimity. Defense counsel had a reasonable basis for rejecting a unanimity instruction-the shot or shots were fired in a continuous course of conduct. Therefore, the error asserted on appeal was invited and appellant is estopped from raising the issue on appeal. (*People v. Lara* (1994) 30 Cal.App.4th 658, 673-674.)

We are unconvinced by appellant's responsive argument that if the alleged error is deemed invited, then defense counsel's agreement to the omission of a unanimity instruction constitutes ineffective assistance of counsel. Both of the victims named in the amended information were present in the car when appellant fired the shot or shots in quick succession. Appellant did not raise a separate defense with respect to each of the victims named in count 2, as he claims in his reply brief. He presented an alibi defense which, if believed by the jury, would have resulted in his acquittal on both counts. Appellant denied firing any shots at the Camry and claimed that he was elsewhere when the crimes occurred. Therefore, it is not reasonably likely that the jury would have returned a more favorable verdict if it had been given a unanimity instruction. (*In re Jackson* (1992) 3 Cal.4th 578, 604 [ineffective assistance claims may be resolved based on lack of prejudice].)

In any event, the foundational premise of appellant's argument is unsound. Appellant was not charged with attempted murder, which is a specific intent crime. The crime of assault with a deadly weapon does not require an identifiable victim, and the naming of a victim is not an element of the crime. This is a general intent crime that does not require a specific intent to injure a specified person. (*People v. Lee* (1994) 28 Cal.App.4th 1724, 1737 (*Lee*)). FN5 In *Lee*, the court held that firing at a crowd is enough to establish the general intent crime of assault. The jury's focus should be on whether the defendant had the general criminal intent to commit an assaultive act that had the direct, natural and probable consequences of applying physical force upon or injury to another, and not on considering whom the defendant intended to injure. (*Id.* at p. 1738.)

FN5. Contrary to appellant's assertion in his reply brief, the portion of the holding in *Lee* that is applicable in this instance was not called into dispute by *People v. Raviart* (2001) 93 Cal.App.4th 258 or *People v. Bland* (2002) 28 Cal.4th 313.

In this instance, due process was satisfied because there was no question which of defendant's acts was the basis for the assault with a firearm count. The prosecutor unequivocally argued that appellant committed an assault with a firearm when he fired one or more shots at the Camry. The evidence supports the conclusion that appellant knew that the car was occupied by two or more people when he fired at it. Thus, the failure to specify a single victim and the absence of an unanimity instruction did not result in a conviction that violated the constitutional unanimity guarantee. Any possible defect in the verdict form for count 2 is harmless beyond a reasonable doubt; appellant's substantial rights did not suffer any prejudice. (*People v. Jones* (1997) 58 Cal.App.4th 693, 710-711.)

"A unanimity instruction serves to ensure jurors' agreement as to the facts constituting an

offense when the evidence shows a greater number of violations of a charged crime than the

number charged. [Citation.]" <u>People v. Burnett</u>, 71 Cal.App.4th 151, 173 (1999).  However,

"[t]he unanimity instruction is not required when the acts alleged are so closely connected as to

form part of one transaction. [Citations.] The 'continuous conduct' rules applies when the

defendant offers essentially the same defense to each of the acts, and there is no reasonable basis

for the jury to distinguish between them. [Citation.]"  <u>People v. Stankewitz</u>, 51 Cal.4th 72, 100

(1990).  Because the parties and the trial court agreed that this case involved continuous conduct

on the part of Petitioner a unanimity instruction was not required.  Petitioner fired one or more

shots at the two victims and offered the same defense as to both victims.  Accordingly, there is

no basis to his claim counsel was ineffective nor was he prejudiced.

K.      <u>Ineffective Assistance Counsel During Plea Negotiations</u>

        Petitioner contends that he was denied effective assistance of counsel during plea

negotiations.  This claim was presented to the Fresno County Superior Court, California Court of

Appeal, and California Supreme Court in post-conviction review petitions.  The Fresno County

Superior Court denied the claim on the merits.  The California Court of Appeal and California

Supreme Court summarily denied the claim, therefore it is presumed these courts denied the

claim on the same basis set forth by the Fresno County Superior Court.  <u>Ylst</u>, 502 U.S. at 803.

        The prosecutor offered Petitioner a deal of four years in exchange for a guilty plea to

assault with a firearm and firearm use.  Petitioner declined the offer.  Petitioner claims his

counsel told him that he "could not be convicted at trial because witnesses had recanted their

incriminating statements" and that "at worst, he would get a hung jury."  Petitioner claims

counsel did not tell him he could be convicted based solely on the witnesses' prior statements.

Petitioner contends had he been aware of such possibility, he would have taken the plea deal.

        A plea of guilty is constitutionally valid only to the extent it is "voluntary" and

"intelligent" and must be made with sufficient information of the relevant circumstances and

likely consequences resulting from the waiver of certain constitutional rights.  <u>Brady v. United

States</u>, 397 U.S. 742, 748 (1970); <u>Boykin v. Alabama</u>, 395 U.S. 238, 242-244 (1969).

Voluntariness is determined by looking at the tangible evidence in the record, as determined by

the totality of the circumstances surrounding the plea.  Id.  The defendant must make the decision

"with the help of counsel, [and] rationally weigh the advantages of going to trial against the

advantages of pleading guilty."  Brady v. United States, 397 U.S. at 750.

The decision to reject a plea bargain offer and go to trial is a critical stage of the

proceedings.  In Hill v. Lockhart, 474 U.S. 52, 56-57 (1985), the Court held that the

voluntariness of a guilty plea depends on the adequacy of counsel's legal advice.  The first

"inquiry is whether counsel's advice was within the range of competence demanded of attorneys

in criminal cases."  Turner v. Calderon, 281 F.3d 851, 879 (9th Cir. 2002).  Then the Court must

determine whether, "but for counsel's errors, [the defendant] would have pleaded guilty and

would not have insisted on going to trial.  Id.  If the defendant has been informed of the plea

offer, the question to determine is whether counsel's "advice was within the range of competence

demanded of attorneys in criminal cases.  Id. at 880 (quoting McMann v. Richardson, 397 U.S.

759, 772 (1970)).  Thus, Petitioner "must demonstrate gross error on the part of counsel[.]"  Id.

(quoting McMann, 397 U.S. at 771).

The state courts' determination of this issue was not contrary to, or an unreasonable

application of, clearly established Supreme Court precedent.  The trial court advised Petitioner of

the terms of the plea offer and the risk of going to trial and being convicted:

> THE COURT: I know, Mr. Brown, you've had a chance to talk to your
> attorney and family last night.  And, you know, I told you before, sir, you know,
> whatever you decide on this is okay with me.  And I just - I do want to say I
> understand - how old are you, 18 or 19?
>
> THE DEFENDANT: 19.
>
> THE COURT: 19.  You know, 19 years old - I'm not trying to talk you out
> of what you want to do here, but 19 years old, you probably think four years,
> that's a long time.  But there is going to be a time when you are 25 years old and
> could be out, right?  And there is - it's also true if you get life in the state prison
> that could very well mean exactly that.  So I just want to make sure that you know
> what you have at risk here.  You've had a chance to talk to your attorney about
> what you have at risk.  And you make the decision that you want to go to trial and
> reject the People's offer that there is no going back.  First of all, you understand
> the People's offer, sir?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: And you know what you have at risk, life in prison if you
> are convicted of everything?

1    THE DEFENDANT: Yes.

2    THE COURT: And what do you want to do, go to trial or take the D.A.'s
3    offer?

4    THE DEFENDANT: Go to trial.

5    (RT 127-128.)

6    Here, Petitioner was adequately informed of his potential life sentence if convicted, and

7    he was informed of the terms of the plea bargain and decided to turn it down.  Therefore,

8    Petitioner had the tools necessary to make an informed decision.  Even if counsel advised

9    Petitioner against accepting the plea offer, there is no showing it constituted deficient

10   performance.  The prosecution's two key witnesses had recanted their statements prior to trial.

11   Fulmer, the driver whose car was shot, recanted her statements to police and testified that she no

12   longer believed Petitioner was the shooter.  In addition, Stanfield, the driver of the car Petitioner

13   was riding in, denied knowing Petitioner or such statements to police.  Thus, in light of the

14   obvious weaknesses in the prosecution's case, it would not have been unreasonable for counsel

15   to recommend proceeding to trial.   As the superior court stated in denying the claim:

16         Here, while petitioner contends that his counsel advised him not to take a
       four-year plea bargain, it appears that counsel's advice was based on a reasonable
17     tactical analysis of the case since several of the witnesses had retracted their
       statements incriminating petitioner, thus strengthening petitioner's defense and
18     making it more likely that he could obtain an acquittal at trial.

19   Petitioner's claim that counsel told him he could not be convicted at trial because

20   witnesses had recanted their incriminating statements and that, "at worst he would get a hung

21   jury," is not adequately supported.  Petitioner has failed to submit any declarations or evidence in

22   support of his ineffective assistance claim.  Even so, the record does not support his claim that

23   counsel was ineffective.  In fact, Petitioner's claim that counsel told him "at worst, he would get

24   a hung jury," shows equivocation by counsel on whether Petitioner would be found guilty.  In

25   McMann, the Supreme Court observed that "uncertainty is inherent in predicting court

26   decisions."  McMann, 397 U.S. at 771.  "Counsel cannot be required to accurately predict what

27   the jury or court might find, but he can be required to give the defendant the tools he needs to

28   make an intelligent decision."  Turner v. Calderon, 281 F.3d at 881.  Furthermore, in determining

1   the reasonableness of counsel's actions the Court must "reconstruct the circumstances of

2   counsel's alleged conduct" and "evaluate the conduct from counsel's perspective at the time."

3   Harrington v. Richter, __ S.Ct. __, 2011 WL 148587 *15.

4          Moreover, Petitioner's self-serving statements, made years after his conviction, that he

5   was advised by counsel he could not be convicted is insufficient to demonstrate he was not aware

6   he could be convicted based solely on the witnesses' prior statements.  See United States v.

7   Allen, 153 F.3d 1037, 1041 (9th Cir. 1998) (citing Cuppett v. Duckworth, 8 F.3d 1132, 1139 (7th

8   Cir. 1993) (en banc) ("[S]elf-serving statements by a defendant that his conviction was

9   constitutionally infirm are insufficient to overcome the presumption of regularity accorded state

10  convictions.").)  As just stated, even if Petitioner's allegations regarding counsel's advise are

11  accepted as true, such advise was not ineffective and Petitioner was properly advised of the

12  consequences of his guilty plea.  The fact that counsel and Petitioner chose to proceed to trial

13  based on counsel's defense strategy to challenge the prosecution's case based on the witnesses'

14  recanted statements and belief he would be acquitted, does not demonstrate that Petitioner was

15  not made fully available of his options.  The fact Petitioner was convicted demonstrates only that

16  counsel's defense strategy was not successful, not that counsel was incompetent.

17  L.      Ineffective Assistance Counsel/Failure to Obtain Favorable Evidence

18          Petitioner contends that trial counsel was ineffective for failing to obtain favorable

19  evidence.   This claim was presented to the Fresno County Superior Court, the California Court

20  of Appeal, and the California Supreme Court in post-conviction proceedings.  The Fresno County

21  Superior Court denied the claim on the procedural ground that Petitioner should have, but did

22  not, raise this claim on direct review.  The California Court of Appeal and California Supreme

23  Court summarily denied the claim, and it is presumed that these courts denied the claim on the

24  same procedural ground identified by the Fresno County Superior Court.  Ylst, 501 U.S. at 803.

25          Petitioner claims counsel was ineffective for failing to introduce Sprint phone records that

26  would have established that Petitioner was not on his cell phone at the time of the shooting.  He

27  contends that introduction of these records at trial would have seriously undermined the

28  prosecutor's case with respect to identity of the shooter and the gang enhancement.  Petitioner

1    has failed to substantiate his claim with submission of the alleged cell phone records.  Petitioner

2    filed three state court collateral petitions and failed to submit the alleged phone records.  Nor has

3    Petitioner submitted such records to this Court, notwithstanding any potential bar to review of

4    such evidence.  Thus, Petitioner's claim is nothing more than an unsubstantiated allegation, and

5    his claim must be denied.

6    M.    Ineffective Assistance Counsel/Failure Present Exculpatory Evidence

7          Petitioner claims counsel failed to present exculpatory evidence which would have been

8    revealed through proper investigation.  As with the prior claim, this claim was presented to the

9    Fresno County Superior Court, the California Court of Appeal, and the California Supreme

10   Court.  Because the Fresno County Superior Court denied the claim on the procedural ground

11   that Petitioner should have, but did not, raise this claim on direct review, this Court assumes the

12   subsequent courts denied the claim on the same procedural ground.  Ylst, 501 U.S. at 803.

13         Petitioner claims counsel should have presented evidence that his brother, Rayquan, was

14   the shooter.  In support of this claim, Petitioner submits the declarations of Jamie Stanfield-the

15   driver of the car Petitioner was in at the time of the shooting, and Kitty Brown-Petitioner's sister.

16         When Jamie Stanfield was initially interviewed by Detective Flowers, she told him

17   Petitioner was the shooter.  However, at trial, Stanfield recanted this statement and testified that

18   no one fired a gun from her car.  Now, Stanfield admits that someone did fire a gun from her car

19   but it was not Petitioner.  Stanfield declares that she initially told Detective Flowers that Rayquan

20   Brown was the shooter.  She also claims that she told Flowers that she had one child and was

21   "pregnant with the child of Rayquan Brown."  Stanfield claims Detective Flowers threatened to

22   call social services and have her daughter taken away from her if she did not testify against

23   Petitioner.  She claims when Flowers turned on the tape recorder, he instructed her to say she

24   barely knew Petitioner, that Petitioner was the shooter, and that Petitioner told her Terrence

25   Williams was his enemy.  She claimed to be told not to mention Rayquan Brown at all.  Stanfield

26   claimed she made such statements out of fear of Flowers.

27         Kitty Brown claims that at the time of the shooting, Stanfield was dating and pregnant by

28   her brother, Rayquan.  Brown contends Petitioner and Rayquan "bear a strong resemblance to

each other." Brown acknowledges she does not know who committed the shooting, but claims that Petitioner and Rayquan arrived at her house together at approximately 8:00 or 9:00 p.m. on the day of the shooting. Brown claims she told Petitioner's defense counsel that Jamie Stanfield "was pregnant with Rayquan's child, in a deep relationship with Rayquan, and that everybody in my family knew it." She claims defense counsel advised her that he was going to have her testify at the trial.

Petitioner contends he told counsel that he suspected Rayquan committed the shooting and that he was romantically involved with Stanfield. Petitioner also claims he also told counsel that he and Rayquan "looked alike" and Stanfield was likely covering for him and implicating Petitioner because "the mother of Petitioner's child had heard from Stanfield's friend that Rayquan had done the shooting." Counsel contacted Rayquan, but he refused to speak with him.

Petitioner's claim that counsel failed to conduct a proper investigation to locate, subpoena, or interview Rayquan is without merit. Petitioner concedes that Rayquan refused to speak or cooperate with Petitioner's counsel. Petitioner has not presented any facts to demonstrate that further contact with Rayquan would have been successful. Therefore, Petitioner's claim is based on nothing more than pure speculation.

Petitioner also claims counsel should have impeached Stanfield with evidence of her relationship with Rayquan. Petitioner is mistaken. Defense counsel had no basis upon which to impeach Stanfield to show that Rayquan was the shooter. Counsel was unaware that Stanfield purportedly told Detective Flowers that Rayquan was the shooter. There is no claim or evidence presented that the police reports contained information that Stanfield implicated Rayquan, nor does Petitioner allege that Stanfield told counsel prior to trial that Rayquan was the shooter. Even if counsel knew of the romantic relationship between Stanfield and Rayquan that is not evidence that he committed the shooting.

Petitioner also claims that counsel should have called Kitty Brown to testify about the romantic relationship between Stanfield and Rayquan. However, the fact that Stanfield and Rayquan may have been romantically involved does not demonstrate he was the shooter. Furthermore, there is no evidence to support Petitioner's contention that Kitty Brown would have

testified to her suspicions that Stanfield was "covering for" Rayquan.  Brown's does not declare

that she believed Rayquan was the shooter or that Stanfield was "covering for" him.  To the

contrary, she admits that she "cannot say if it was Rayquan who actually committed the shooting

. . ."  Defense counsel interviewed Kitty Brown prior to trial and reasonably concluded not to call

her as a witness.

      "[T]he test for prejudice is whether the noninvestigated evidence was powerful enough to

establish a probability that a reasonable attorney would decide to present it and a probability that

such presentation might undermine the jury verdict."  Mickey v. Ayers, 606 F.3d 1223, 1236-

1237 (9th Cir. 2010).  Petitioner has failed to demonstrate what evidence counsel failed to

discover and that, had this evidence been presented at trial, there is a reasonable probability he

would not have been convicted.  Petitioner presents nothing more than his speculation that his

brother, Rayquan, was the shooter.  Such speculation is not evidence.  See e.g. Wildman v.

Johnson, 261 F.3d 832, 839 (9th Cir. 2001) ("speculation" that a helpful expert could be found or

would testify for petitioner not sufficient to show prejudice).

      Petitioner's claim that he told counsel the mother of his child heard from a friend of

Stanfield's that Rayquan had done the shooting is also without merit.  In presenting a claim of

ineffective assistance based on counsel's failure to call witnesses, Petitioner must identify the

witness, U.S. v. Murray, 751 F.2d 1528, 1535 (9th Cir. 1985), show that the witness was willing

to testify, U.S. v. Harden, 846 F.2d 1229, 1231-32 (9th Cir. 1988), and show that the witness's

testimony would have been sufficient to create a reasonable doubt as to guilt.  Tinsley v. Borg,

895 F.2d 520, 532 (9th Cir. 1990); see also United States v. Berry, 814 F.2d 1406, 1409 (9th Cir.

1989) (holding that where defendant did not indicate what witness would have testified to and

how such testimony would have changed the outcome of the trial, there can be no ineffective

assistance of counsel).  Petitioner presents a multiple hearsay statement but fails to identify the

individual who allegedly made the statement, present any basis to establish this individual's

knowledge, or show the witness was available and willing to testify at trial.  Accordingly,

Petitioner has failed to establish a Strickland violation and the claim must be denied.

///

N.    Shackling During Trial

Petitioner contends that his wearing ankle shackles during trial violated his right to due process and an impartial jury.  This claim was presented to the Fresno County Superior Court, the California Court of Appeal, and the California Supreme Court.   Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the Fresno County Superior Court, the last state court to have issued a reasoned opinion.  Ylst v. Nunnemaker, 501 U.S. at 803.

Defense counsel and the sheriff's office came to an agreement whereby Petitioner would wear "some kind of a restraint under the table so there wouldn't be more than one bailiff in the courtroom."  (RT 177.)  The trial court stated that although "those arrangements are fine," "they are between you and the sheriff's department."  (RT 178.)  The court made clear that it had "not determined that there is any need for a restraint of any kind and you haven't asked me to make a finding in that regard or to do something other than these arrangements that you've made."  (RT 178.)  Defense counsel replied, "That's correct."  (Id.)

"A criminal defendant has a constitutional right to be free of shackles and handcuffs in the presence of the jury absent an essential state interest that justifies the physical restraints."  Williams v. Woodford, 384 F.3d 567, 591 (9th Cir. 2004) (citing Ghent v. Woodford, 279 F.3d 1121, 1132 (9th Cir. 2002) and Rhoden v. Rowland, 172 F.3d 633, 636 (9th Cir. 1999).  A shackling claim brought on federal habeas review, however, is subject to harmless error analysis under Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).  Under Brecht, the Court must determine whether the shackling had a substantial and injurious effect on the verdict.  Duckett v. Godinez, 67 F.3d 734, 749 (9th Cir. 1995).

Petitioner contends the trial court was required to make a finding that the use of restraints was justified, notwithstanding counsel's agreement to their use.  Even if it is assumed the trial court erred, Petitioner has not demonstrated that he suffered any prejudice.  First, there is no evidence in the record that the jury ever saw Petitioner's ankle shackles.  Defense counsel agreed with the sheriff's department to place ankle restraints on Petitioner so that two deputies were not required in the courtroom.  There is simply no showing that the outcome of Petitioner's trial was

1   affected in any way by his shackling.  Accordingly, the state court's resolution of this claim was

2   neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

3   <u>Williams</u>, 529 U.S. at 412-413.

4   O.   <u>Due Process Violation/Right to Impartial Jury</u>

5        Petitioner contends that contact between a juror and someone "associated with the

6   People's case" violated his constitutional rights.

7        The Sixth Amendment guarantees criminal defendants the right to a "fair trial by a panel

8   of impartial, 'indifferent' jurors."  <u>Irwin v. Dowd</u>, 366 U.S. 717, 722 (1961).  "If only one juror is

9   unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth

10  Amendment right to an impartial panel."  <u>United States v. Hendrix</u>, 549 F.2d 1225, 1227 (9th

11  Cir. 1997).

12       The Sixth Amendment also requires the verdict to be based only on the evidence

13  produced at trial.  <u>Turner v. Louisiana</u>, 379 U.S. 466, 472-473 (1965) ("[T]rial by jury in a

14  criminal case necessarily implies at the very least that the 'evidence developed' against a

15  defendant shall come from the witness stand in a public courtroom where there is full judicial

16  protection of the defendant's right of confrontation, of cross-examination, and of counsel").

17  Juror misconduct occurs when a member of the jury introduces into its deliberations extrinsic

18  facts which were not admitted in evidence or provided in the instructions.  <u>Thompson v. Borg</u>, 74

19  F.3d 1571, 1574 (9th Cir. 1996).  But "[d]ue process does not require a new trial every time a

20  juror has been placed in a potentially compromising situation."  <u>Smith v. Phillips</u>, 455 U.S. 209,

21  217 (1982).  The Supreme Court has held that the remedy for allegations of juror misconduct or

22  bias is the requirement that the trial court determine the circumstances of what transpired, the

23  impact on the juror, and whether or not it was prejudicial.  <u>Remmer v. United States</u>, 347 U.S.

24  227, 229-230 (1954); <u>see also</u> <u>Smith v. Phillilps</u>, 455 U.S. at 216-217.     A petitioner is entitled

25  to habeas corpus relief only if the evidence had a substantial and injurious effect or influence on

26  the verdict.  <u>Lawson v. Borg</u>, 60 F.3d 608, 612 (9th Cir. 1995).

27       The record reveals that Juror No. 4 came "into contact outside of the court with an

28  individual who, although not a witness, was associated with the People's case transporting

witnesses or something of that nature." Petitioner claims the person was a detective or partner of

Detective Flowers. To ensure the contact did not have an affect on the juror's judgment, the trial

court questioned the juror outside the presence of the other jurors, but in the presence of the

prosecutor and Petitioner's counsel. Both the prosecution and Petitioner's counsel agreed that

the identity of the person with whom Juror No. 4 had contact was not necessary. The trial court

went on:

> THE COURT: . . . Then to protect their confidentiality we're just going to propose to ask of this juror whether he thinks that the contact with that individual might in any way affect his judgment in this case. And I'm going to let this juror know that from what little we've understood about this contact he doesn't have to tell us at all any details about when and how it took place or whether he even knows that it was somebody that was involved in this case. But to see if anything like that might affect his judgment.

> MR. TORRES [defense counsel]: I agree with that.

> THE COURT: That's a pretty vague way to put it. But I suppose – is there anything wrong with – in terms – so this juror knows something about what we're talking about here, reflecting the fact that there was an individual who was identified as transporting witnesses here in the courtroom is the person we're talking about.

> MR. FRYE [prosecutor]: I think that's fine.

> THE COURT: That's okay.

> MR. TORRES: Agreed.

> . . .

> THE COURT: . . . And the record should reflect that Juror Number Four, ****4, has just joined us. And I don't want you to get nervous about what they are bringing me in here for? I'll tell you what's happened here, sir, is that during the course of the trial there was a gentleman who was here in court. He did not testify in this case but was out in the audience at one point being on the left side of the courtroom here as we're looking at it. And it's come to the attention of counsel here that you may have had some contact outside of court with that person. And I want to start by saying I don't want you to tell us anything at all. And you don't need to give us any detail about where that took place or the circumstances or anything. That's completely confidential. We all understand that. All we want to know, first of all, do you remember there being a contact like that?

> JUROR SEAT NUMBER FOUR: Yes.

> THE COURT: Yes? Okay. Now the only question, then, is there anything about that that you think would affect your judgment in any way in this case?

> JUROR SEAT NUMBER FOUR: No.

1    THE COURT: Okay.  I think you answered the question for me.  Any
     further inquiries as far as you are concerned, either counsel?

2

3    MR. TORRES: None.

4    MR. FRYE: None.

5   (RT 897-900.)

6        As demonstrated above, Petitioner, by and through his counsel, waived any due process

7   challenge to the procedures employed by the trial judge in investigating the question of juror

8   bias.  In <u>New York v. Hill</u>, 528 U.S. 110 (2000), the Supreme Court discussed circumstances

9   when an attorney may waive certain rights on behalf of his client:

10          What suffices for waiver depends on the nature of the right at issue.
        "[W]hether the defendant must participate personally in the waiver; whether
11      certain procedures are required for waiver; and whether the defendant's choice
        must be particularly informed or voluntary, all depend on the right at stake."
12      *United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct 1770, 123 L.Ed2d 508
        (1993).  For certain fundamental rights, the defendant must personally make an
13      informed waiver.  *See, e.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 464-465, 58 S.Ct.
        1019, 82 L.Ed. 1461 (1938) (right to counsel); *Brookhart v. Janis*, 384 U.S. 1, 7-
14      8, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966) (right to plead not guilty).  For other
        rights, however, waiver may be effected by action of counsel.  "Although there are
15      basic rights that an attorney cannot waive without the fully informed and publicly
        acknowledged consent of the client, the lawyer has-and must have-full authority to
16      manage the conduct of the trial."  *Taylor v. Illinois*, 484 U.S. 400, 417-418, 108
        S.Ct. 646, 98 L.Ed.2d 798 (1988).  As to many decisions pertaining to the conduct
17      of the trial, the defendant is "deemed bound by the acts of his lawyer-agent and is
        considered to have 'notice of all facts, notice of which can be charged upon the
18      attorney."  *Link v Wabash R. Co.*, 380 U.S. 626, 634, 82 S.Ct. 1386, 8 L.Ed.2d
        734 (1962) (quoting *Smith v. Ayer*, 101 U.S. 320, 326, 25 L.Ed. 955 (1880)).
19      Thus, decisions by counsel are generally given effect as to what arguments to
        pursue, *see Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987
20      (1983), what evidentiary objections to raise, *see Henry v. Mississippi*, 379 U.S.
        443, 451, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), and what agreements to conclude
21      regarding the admission of evidence, *see United States v. McGill*, 11 F.3d 223,
        226-227 (C.A. 1 1993).  Absent a demonstration of ineffectiveness, counsel's
22      word on such matter is the last.  *Ibid*.

23  <u>Id</u>. at 114-115.

24       The trial court's determination on juror bias is entitled to the presumption of correction

25  because it "involves credibility findings whose basis cannot be easily discerned from an appellate

26  record."  <u>Wainwright v. Witt</u>, 469 U.S. 412, 429 (1985).  The record demonstrates the trial court

27  made a reasonable inquiry and determined that the Juror No. 4 would be fair and impartial.  Juror

28

No. 4 was questioned by the trial judge about his contact with the third party outside the

courtroom.  The questioning took place outside the presence of the other jurors and in the

presence of the prosecutor and Petitioner's counsel.  Petitioner's counsel expressly consented to

the manner in which the trial judge conducted the inquiry.  (RT 897-900.)  The judge asked Juror

No. 4 if there was anything about his contact with the third party that would affect his judgment

in the case in any way.  The juror replied, "No."  (RT 899.)  The trial judge asked both parties

whether they had any further inquiries of the juror, and both parties responded, "No."  (RT 899.)

Petitioner cannot now complain about the thoroughness of the trial court's inquiry because he is

"deemed bound" to the actions of his counsel which pertained to the conduct of the trial.  Link v.

Wabash R. Co., 370 U.S. at 626.

In any event, Petitioner has failed to overcome the presumption of correctness by

producing clear and convincing evidence that Juror No. 4 was actually biased.  Nor has Petitioner

established that further examination of Juror No. 4 would have demonstrated that the juror was

biased.  Strickland, 466 U.S. at 687-688, 694 (to demonstrate prejudice, petitioner must show

there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different"); Corjasso v. Attorney General of California, 304 Fed.

Appx. 567, 569, 2008 WL 5341868, *1 (9th Cir. Dec. 22, 2008) (unpublished decision) (even

assuming counsel was deficient in examination of juror for possible bias, petitioner failed to

establish prejudice under Strickland since there was no "evidence of actual juror bias") (citing

Fields v. Brown, 503 F.3d 755, 776 (9th Cir. 2007) (finding no prejudice where there was no bias

because "[r]eplacement of one unbiased juror with another unbiased juror should not alter the

outcome").)   Accordingly, habeas relief is foreclosed.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.	The instant petition for writ of habeas corpus be DENIED; and

2.	The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District

Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the

Local Rules of Practice for the United States District Court, Eastern District of California.
Within thirty (30) days after being served with a copy, any party may file written objections with
the court and serve a copy on all parties.  Such a document should be captioned "Objections to
Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served
and filed within fourteen (14) days after service of the objections.  The Court will then review the
Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that
failure to file objections within the specified time may waive the right to appeal the District
Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


   IT IS SO ORDERED.

   **Dated:   February 3, 2011**                        **/s/ Dennis L. Beck**
                                                    UNITED STATES MAGISTRATE JUDGE

36